UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER WATERKEEPER, an Idaho non-profit corporation, | Case No. 1:23-cv-00239-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| J.R. SIMPLOT COMPANY, a Nevada corporation; and SIMPLOT LIVESTOCK CO., a Nevada corporation, | |
| Defendants. | |

## I. INTRODUCTION

Before the Court is Defendants J.R. Simplot Company and Simplot Livestock Co.'s (collectively, "Simplot") Motion to Dismiss. Dkt. 21. Plaintiff Snake River Waterkeeper ("SRW") opposed the Motion (Dkt. 26) and Simplot replied. Dkt 28. On November 9, 2023, the Court heard oral argument and took the matter under advisement. Dkt. 32.

For the reasons set forth below, Simplot's Motion to Dismiss is DENIED.

## II. BACKGROUND

### A. Factual Background

SRW is a non-profit corporation dedicated to protecting and improving the Snake River and its surrounding communities. To further its mission, SRW actively seeks federal

and state implementation of environmental laws and, when necessary, directly initiates enforcement actions on behalf of itself and its members.

Simplot owns and operates a confined cow feedlot ("Feedlot") and related land application fields located at or near 1301 Hwy 67, Grand View, ID 83624. Together, the Feedlot and land application fields (collectively the "Grand View Facility") span approximately nine square miles. Dkt. 21-1, at 7.[1] The Grand View Facility is the largest confined animal feeding operation in Idaho—and one of the largest in the United States—with a one-time capacity of 150,000 head of cattle. Located in the Snake River canyon south of Boise and west of Mountain Home, the Grand View Facility generates approximately 47,450 tons of manure every year.

SRW alleges Simplot has failed, and continues to fail, to properly manage manure at the Grand View Facility. Among other problems, SRW contends Simplot is unable to control precipitation that flows onto the Feedlot, overapplies manure to the land application fields, and fails to otherwise adequately collect, contain, and dispose of manure. As a result, manure and manure-laden water from the Grand View Facility allegedly course through streams, canals, and ditches into the Snake River.

On January 31, 2023, SRW provided Simplot with a 60-day notice (hereinafter "SRW's Notice") detailing its intent to initiate a citizen suit against Simplot. Dkt. 1-1. SRW's Notice alleged Simplot has violated, and continues to violate, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., and applicable state water pollution control laws, by

---

[1] Page citations are to the ECF-generated page number.

discharging pollutants from the Grand View Facility to waters of the United States without first obtaining coverage under a valid National Pollutant Discharge Elimination System ("NPDES") permit.

When Simplot failed to correct its alleged violations within 60 days, SRW filed the instant citizen suit on May 9, 2023, seeking declaratory and injunctive relief due to Simplot's unpermitted discharge of pollutants from the Grand View Facility to the Snake River. Dkt. 1. Simplot answered SRW's Complaint on June 5, 2023. Dkt. 14. On July 5, 2023, Simplot filed the instant Motion to Dismiss, arguing the Court lacks subject matter jurisdiction and, in the alternative, that SRW fails to state a claim.[2] Dkt. 21-1.

### B. Legal Framework

*1. CWA*

The CWA "aims to restore and maintain the chemical, physical and biological integrity of [the] Nation's waters." *Ass'n to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002) (cleaned up). To further this goal, a person[3] having an interest which is adversely affected may bring a citizen suit against a person alleged to be in violation of one of the CWA's provisions. 33 U.S.C. § 1365(a)(1) & (g).

Under the CWA, the discharge of pollutants from a point source[4] to navigable

---

[2] Presumably because it had already answered SRW's Complaint when it filed its Motion to Dismiss, Simplot brings this portion of its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(c). Dkt. 21-1, at 22 n.12.

[3] The CWA defines "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

[4] A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal*

waters—like the Snake River—is prohibited unless such discharges are authorized by a NPDES permit. 33 U.S.C. § 1311(a). To state a claim under the CWA, a plaintiff must plead facts supporting allegations that: 1) a person 2) discharged 3) a pollutant[5] 4) to the waters of the United States 5) from a point source 6) without or in violation of a NPDES permit. *S.F. Bay Keeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011).

The Grand View Facility constitutes a "concentrated animal feeding operation" ("CAFO") and is thus a "point-source" under the CWA. 33 U.S.C. § 1362(14). Discharges from a CAFO are prohibited unless a facility first obtains an NPDES permit. 40 C.F.R. § 122.23(d)(1).[6] Simplot admits that it does not have presently have a NPDES permit authorizing discharges from the Grand View Facility.[7] Dkt. 14, ¶ 35. Because the Grand View Facility lacks a NPDES permit, SRW contends "each and every discharge from [the

---

*feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added).

[5] The term "pollutant" means: "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

[6] Although agricultural stormwater discharges caused exclusively by precipitation are exempted from the definition of "point source" so long as manure and process wastewater are applied consistently with site specific nutrient management plans, 40 C.F.R. § 122.23(e), SRW maintains Simplot applies manure to its land application fields in quantities, and at rates and times, that are not compliant with Simplot's nutrient management plans, if any. Dkt. 1-1, at 6; Dkt. 1, ¶ 57.

[7] However, Simplot asserts the Grand View Facility does not discharge pollutants, so a NPDES permit is not required. Dkt. 14, ¶ 35; Dkt. 28, at 9. While this contention is relevant to whether SRW can ultimately prove its claim, it is not before the Court at this stage of the proceedings. In its Motion to Dismiss, Simplot does not suggest this contention deprives the Court of jurisdiction and, even if it had, SRW clearly disputes it. As such, the merits of Simplot's defense that it does not discharge pollutants is not currently before the Court.

Grand View Facility] is an actionable violation" of the CWA. Dkt. 26, at 6.

### 2. Notice Requirement

Prior to bringing suit to enforce the CWA, a citizen plaintiff is required to give 60-days' notice of any alleged violation to the alleged violator, the United States Environmental Protection Agency ("EPA"), and the State in which the alleged violation occurs. 33 U.S.C. § 1365(b)(1)(A).[8] The 60-day notice requirement strikes "a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989).[9] A "strictly construed notice requirement preserve[s] that balance in two ways: by giving government entities the first opportunity to enforce environmental regulations and by giving the alleged violator a chance to comply with the CWA, thereby making a citizen suit unnecessary." *Friends of Frederick Seig Grove # 94 v. Sonoma Cnty. Water Agency*, 124 F. Supp. 2d 1161, 1166 (N.D. Cal. 2000) ("*Friends of Frederick*").

"Under a literal reading of the [CWA], compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit." *Hallstrom*, 493 U.S. at 26. As such, "a district court may not disregard [the notice requirement] at its discretion." *Id.* at

---

[8] As further detailed below, the EPA adopted a regulation governing the sufficiency of a 60-day notice. 40 C.F.R. § 135.3(a).

[9] In *Hallstrom*, the United States Supreme Court interpreted the 60-day notice provision of the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 6972. The RCRA and CWA impose "almost identical" notice requirements, as does the Endangered Species Act ("ESA"). *Ecological Rts. Found. v. Pac. Gas and Elec. Co.*, 713 F.3d 502, 518–19 (9th Cir. 2013) (citing 40 C.F.R. § 135.3(a) and 40 C.F.R. § 254.3(a)); *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 650 (9th Cir. 2015). Accordingly, courts may look to interpretations of the notice provisions of the RCRA and ESA when assessing whether notice is adequate under the CWA. *Id.* at 650.

31. Because the notice requirement is a mandatory precondition to suit, it is "in that sense a 'jurisdictional prerequisite.'" *Id.* (quoting *Real Estate Assn., Inc., v. McNary*, 454 U.S. 100, 137 (1981)).

### 3. Simplot's Motion to Dismiss

To consider this case, the Court must not only find that SRW's Notice was adequate, but must also find that SRW has alleged sufficient facts to show Simplot's discharge is "ongoing." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (holding the CWA "does not permit citizen suits for wholly past violations"; rather, the statute "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation."); *Nat. Res. Def. Council v. Sw. Marine, Inc*., 236 F.3d 985, 998 (9th Cir. 2000) (explaining the court has jurisdiction only when citizen-plaintiffs make good-faith allegations of ongoing violation).

In its Motion to Dismiss, Simplot first argues the Court lacks subject matter jurisdiction due to the alleged insufficiency of SRW's Notice. Dkt. 21, at 14–22. Specifically, Simplot maintains SRW's Notice "failed to describe exactly where, when, and how such alleged illicit discharges occur on or from [the Grand View Facility] as required by the citizen suit implementing regulation." Dkt. 21-1, at 7. In addition, Simplot maintains the Court lacks jurisdiction because SRW's Notice failed to establish that Simplot's "so-called" discharges are "ongoing." *Id.* at 21. Finally, even if the Court determines it has subject matter jurisdiction, Simplot argues SRW's Complaint should be dismissed for failure to state a claim because it recites vague and conclusory allegations of the elements of a cause of action under the CWA, but fails to allege sufficient facts to

support such elements.

## III. LEGAL STANDARDS

### A. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and are presumptively without jurisdiction over civil actions. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (explaining federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree") (cleaned up). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). When jurisdiction is challenged on a motion to dismiss, the "party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986).

A party who brings a jurisdictional challenge may do so by referring to the face of the pleadings or by presenting extrinsic evidence. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual."). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve a facial challenge, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the party opposing dismissal. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citing *Pride v. Correa,* 719 F.3d 1130, 1133 (9th Cir. 2013)).

By contrast, in a factual attack, the challenger "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Leite*, 749 F.3d

at 1121. In resolving a factual attack on jurisdiction, "the court need not presume the truthfulness of the plaintiff's allegations" and may review evidence outside of the complaint without converting the motion to dismiss into a motion for summary judgment. *Safe Air for Everyone*, 373 F.3d at 1039. "However, where the [jurisdictional and substantive issues] are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citations omitted).

Although Simplot does not specify whether it brings a facial or factual attack, Simplot's jurisdictional challenge neither contests the truth of SRW's allegations, nor relies on matters outside of the pleadings.[10] Simplot has thus brought a facial attack on the Court's subject matter jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039; *see also N. Cal. River Watch v. Honeywell Aerospace*, 830 F. Supp. 2d 760, 765 (N.D. Cal. 2011) ("*Honeywell*") (noting challenge to sufficiency of 60-day notice in CWA case was a facial jurisdictional attack). The Court accordingly accepts the allegations in SRW's Complaint as true and draws all reasonable inferences in favor of SRW. *Leite*, 749 F.3d at 1121.

### B. Rule 12(c)

After the pleadings have closed, but early enough not to delay trial, a party may

---

[10] "If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint." *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987). Instead, attached documents "are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." *Id*. (citing *Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429–30 (9th Cir. 1978)). Because SRW's Notice was attached to its Complaint (Dkt 1-1), the Court may consider the Notice when assessing Simplot's Motion to Dismiss without converting the Motion to Dismiss into a motion for summary judgment. *Safe Air for Everyone*, 373 F.3d at 1039.

move for judgment on the pleadings. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), are "functionally identical." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). As such, the same standard of review applies to motions brought under either rule. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Thus, a Rule 12(c) motion may be based on the inability to state a claim or lack of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

To sufficiently state a claim to relief, a pleading "does not need detailed factual allegations," however, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and conclusions [or] a formulaic recitation of the elements of a cause of action will not do[.]" *Id*. Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## IV. ANALYSIS

### A. Subject Matter Jurisdiction

As noted, Simplot argues the Court lacks subject matter jurisdiction both because SRW's Notice failed to adequately apprise Simplot of its purportedly unlawful activities and because SRW's Notice did not show that Simplot's alleged discharges are ongoing.

MEMORANDUM DECISION AND ORDER – 9

The Court considers each contention in turn. Before doing so, however, the Court briefly addresses SRW's argument that the CWA's notice provision is not a jurisdictional requirement under the "clear statement" test articulated by the United States Supreme Court in *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

Under the "clear statement" test, a statutory provision will only be construed as "jurisdictional" if Congress clearly so states. *Id.* at 515–16; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (explaining a statutory condition that requires a party to take certain action before filing a lawsuit is not automatically jurisdictional but may instead constitute a precondition to filing a particular claim). SRW argues the CWA's notice requirement is not jurisdictional because the statutory text "does not refer to jurisdiction, and [the notice requirement] is located in the CWA notice subsection, rather than the jurisdiction subsection[.]" Dkt. 26, at 19. SRW further maintains that even if the notice requirement is jurisdictional, SRW's Notice sufficiently apprised Simplot of its unlawful activities. Dkt. 26, at 7–17.

Since the Court agrees with SRW's latter contention, it does not further address the former. That is, because the Court finds SRW's Notice provided Simplot with sufficient notice of Simplot's alleged violations, this "mandatory precondition" to suit was satisfied, regardless of whether the CWA's notice requirement is jurisdictional.[11] *Hallstrom*, 493 U.S. at 31.

---

[11] The Court does note, however, that despite the "clear statement test" identified in *Arbaugh*—a case which did not involve or interpret the CWA—district courts within the Ninth Circuit, and the Ninth Circuit itself, have continued to find the CWA's notice requirement is jurisdictional since *Arbaugh* was decided. *Compare Arbaugh*, 546 U.S. at 516 *with San Francisco Herring Ass'n  v. Pac. Gas & Elec., Co.*, 81 F. Supp. 3d 847, 857 (N.D. Cal. 2015) ("Where a citizen enforcement action fails to comply with CWA notice requirements,

*1. Sufficiency of SRW's Notice*

Under 40 C.F.R. § 135.3(a), a 60-day notice must provide the alleged violator with "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation[.]" The Court finds SRW's Notice satisfied each of these requirements.

a. Applicable standard, violative activities, and parties

SRW's Notice informed Simplot of the specific standard alleged to have been violated by alerting Simplot that the Grand View Facility is a CAFO and thus constitutes a point source under the CWA. Dkt. 1-1, at 2 (citing 33 U.S.C. § 1362(14)). SRW's Notice explained that Section 402 of the CWA (33 U.S.C. § 1342) established the NPDES Program, which controls water pollution by regulating point sources. Dkt. 1-1, at 2. SRW's Notice also highlighted that pursuant to Section 301 of the CWA, "a CAFO is prohibited from discharging pollutants into waters of the United States unless that CAFO has coverage under, and complies with, a general or individual NPDES permit." *Id*. (citing 33 U.S.C. § 1311(a)). SRW's Notice stated, "[u]pon information and belief, Simplot does not possess an individual or general CAFO NPDES Permit for the [Grand View Facility], making each and every discharge a violation" of the CWA. *Id*. at 4. SRW's Notice thus informed Simplot

---

the district court lacks subject matter jurisdiction and must dismiss the action."); *Ctr. for Biological Diversity v. Marina Point Dev. Co*., 566 F.3d 794, 800 (9th Cir. 2009) ("[T]he giving of a 60-day notice is not simply a desideratum; it is a jurisdictional necessity."); *Cottonwood Envtl. Law Ctr v. Edwards*, 86 F.4th 1255, 1264 (9th Cir. 2023) ("For a federal court to exercise subject matter jurisdiction over a private CWA claim, the individual or entity bringing the claim must give a 60-day notice of intent to sue.") (cleaned up).

of the specific statutory standard it has purportedly violated and allegedly continues to violate—33 U.S.C. §§ 1311(a)—and how to remedy this violation: obtain a NPDES permit.

SRW's Notice also informed Simplot of its activities that allegedly violate the CWA by outlining the legal requirements for CAFOs. SRW highlighted the EPA's regulations define CAFOs as having two primary components: the "production area" and the "land application area." Dkt. 1-1, at 3 (citing 40 C.F.R. § 122.23(b)(8)). The production area means the part of the CAFO that includes:

> the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas. The animal confinement area includes but is not limited to open lots, housed lots, feedlots, confinement houses, stall barns, free stall barns, milkrooms, milking centers, cowyards, barnyards, medication pens, walkers, animal walkways, and stables. The manure storage area includes but is not limited to lagoons, runoff ponds, storage sheds, stockpiles, under house or pit storages, liquid impoundments, static piles, and composting piles. The raw materials storage area includes but is not limited to feed silos, silage bunkers, and bedding materials. The waste containment area includes but is not limited to settling basins, and areas within berms and diversions which separate uncontaminated storm water.

Dkt. 1-1, at 3 (quoting 40 C.F.R. § 122.23(b)(8)).

The "land application area" means land under the control of a CAFO "owner or operator, whether it is owned, rented, or leased, to which manure, litter or process wastewater from the production area is or may be applied." *Id*. (quoting 40 C.F.R. § 122.23(b)(3)).

SRW's Notice explained that discharges of manure or "process wastewater"[12] from

---

[12] "Process wastewater" means "water directly or indirectly used in the operation of the CAFO for any or all of the following: spillage or overflow from animal or poultry watering systems; washing, cleaning, or flushing pens, barns, manure pits, or other CAFO facilities; direct contact swimming, washing, or spray cooling of animals; or dust control. Process wastewater also includes any water which comes into contact

a production area are strictly prohibited. *Id*. The only regulatory exception is when precipitation causes an "overflow"[13] of manure or process wastewater. In that circumstance, a discharge is authorized only to the extent that: (1) the "production area is designed, constructed, operated and maintained to contain all manure … and process wastewater including the runoff and the direct precipitation from a 25-year, 24-hour rainfall event"; and (2) the "production area is operated in accordance with the additional measures and record-keeping requirements found in 40 C.F.R. § 412.37(a) and (b)." Dkt. 1-1, at 3 (citing 40 C.F.R. § 412.31(a)). In addition, for this exception to apply, the facility must first have a valid NPDES permit. 33 U.S.C. § 1311(a). Further, pursuant to 40 C.F.R. § 122.42(e)(1)(iii), a CAFO-owner must "ensure that clean water is diverted, as appropriate, from the production area." Dkt. 1-1, at 3. SRW's Notice also highlighted that, for the land application area of a CAFO, discharges of manure or process wastewater are prohibited unless such discharges are caused by precipitation and the CAFO maintains adequate records showing agricultural utilization of manure nutrients.[14] *Id*. at 3 (citing 40 C.F.R. § 122.42(e)(1)(vi)–(ix)).

---

with any raw materials, products, or byproducts including manure, litter, feed, milk, eggs, or bedding." 40 C.F.R. § 412.2(d). SRW maintained: "In this regard, run-on water from upland areas that comes into contact with any raw materials, products, or byproducts at [the Feedlot], including manure from cattle, constitutes 'process wastewater.'" Dkt. 1-1, at 3 n.2.

[13] An "overflow" means "the discharge of manure or process wastewater resulting from the filling of wastewater or manure storage structures beyond the point at which no more manure, process wastewater, or storm water can be contained by the structure." 40 C.F.R. § 412.2(g).

[14] Although agricultural stormwater discharges caused exclusively by precipitation are exempted from the definition of "point source" so long as manure and process wastewater are applied consistently with site specific nutrient management plans, 40 C.F.R. § 122.23(e), SRW's Notice alleged that Simplot applies manure to its land application fields in quantities, and at rates and times, that are not compliant with Simplot's nutrient management plans, if any. Dkt. 1-1, at 6.

Under the heading "**VIOLATIONS OF THE CLEAN WATER ACT**," SRW's Notice explained Simplot discharges manure and process wastewater from the Grand View Facility[15] without: (1) a valid NPDES permit: (2) designing, constructing, operating, or maintaining the Feedlot in a manner that contains all manure and process wastewater falling on and entering the site during a 25-year, 24-hour rainfall event; (3) operating the Feedlot in accordance with the record-keeping requirements of 40 C.F.R. § 412.37; (4) ensuring that clean water is diverted away from the Feedlot; and (5) applying manure to the land application fields in quantities, and at rates and times, that are compliant with Simplot's nutrient management plans, if any. Dkt. 1-1, at 4–5.

In support of such contentions, SRW's Notice explained that precipitation and run-on from upgradient areas comingles with manure and process wastewater at the Feedlot, where it subsequently discharges into the Snake River, as well as into tributaries that flow into the Snake River. *Id.* at 5. As evidence, SRW submitted aerial images showing the lack of clean water "diversion structures, adequate wastewater containment structures, or alternative conservation measures such as wastewater treatment facilities to control precipitation falling on [the Feedlot] and any related stormwater entering the site." *Id.* SRW's Notice also cited Simplot's own comments to the EPA concerning the re-issuance of the CWA general permit for CAFOs in Idaho. *Id.* at 4–5 n.4. Specifically, when commenting on the proposed reissuance, Simplot admitted that it does not divert clean

---

[15] In its Motion to Dismiss, Simplot separates its Feedlot and land application fields into two distinct components and argues SRW's Notice was insufficient as to each. Dkt. 21-1, at 15–19. However, Simplot's Feedlot and land application fields together constitute a CAFO and thus a singular point source under the CWA. 33 U.S.C. § 1362(14). As such, the Court generally considers the sufficiency of SRW's Notice with respect to the Grand View Facility as a whole.

water from the Feedlot because Simplot believes such an endeavor "is not appropriate or feasible" due to, among other things, "the enormous volume of run on water from thousands of acres" of upgradient property, which includes land owned by both Simplot and the Bureau of Land Management. *Id*. SRW's Notice explained that excluding barren land owned by the United States government, Simplot is the exclusive owner of the developed, upgradient property from the Feedlot, which includes the land application fields. *Id*. SRW's Notice included a map of Simplot's parcel ownership to support the latter contention. *Id*. at 11.

For discharges from Simplot's land application fields, SRW's Notice maintained that Simplot applies manure generated by tens of thousands of cattle at the Feedlot "in quantities, and at rates and times" that are not compliant with Simplot's nutrient management plans, if any,[16] which in turn causes manure to discharge through "pipes, culverts, drains, and other conduits into the irrigation ditches and canals that are tributaries to the Snake River[.]" *Id*. at 6. In support, SRW included water quality testing results illustrating that the waters into which the Grand View Facility allegedly discharges are contaminated with manure pollutants. *Id*. at 6–8. In addition, SRW identified the specific parcel numbers of the land application fields at issue. *Id*. at 6 n.6.

While Simplot argues SRW's Notice was insufficient because it failed to apprise Simplot of where, when, and how Simplot's allegedly unlawful discharges occurred,

---

[16] SRW highlights that field-specific manure application records are only publicly available if a CAFO maintains a NPDES permit. Because Simplot does not have a NPDES permit for the Grand View Facility, SRW lacks access to Simplot's private records. Dkt. 26, at 14 n. 5.

Simplot does not appear to dispute that SRW's Notice adequately identified both the specific standard alleged to be violated and the specific activities alleged to violate this standard. Dkt. 21-1, at 15–21. Nor does Simplot dispute that SRW adequately identified Simplot as the person or persons responsible for the alleged violation. *See generally* Dkt. 21-1; Dkt. 1-1.

The Court accordingly finds SRW's Notice sufficiently identified 33 U.S.C. § 1311(a) as the specific CWA standard allegedly violated. Dkt. 1-1, at 2–4. SRW's Notice also adequately identified the activities alleged to constitute a violation of this standard: (1) discharging pollutants without a valid NPDES permit; (2) failing to install diversion structures, adequate wastewater containment structures, or alternative conservation measures to control precipitation falling on the Grand View Facility and any related stormwater entering the site; (3) failing to operate the Feedlot in accordance with the record-keeping requirements of 40 C.F.R. § 412.37; (4) failing to ensure that clean water is diverted away from the Feedlot; and (5) failing to apply manure to the land application fields in quantities, and at rates and times, that are compliant with Simplot's site-specific nutrient management plans. *Id*. at 4–7. SRW's Notice also adequately identified Simplot as the entity responsible for such alleged violations. *Id*. at 4.

### b. Location and method of alleged violations

Rather than challenging SRW's identification of the relevant parties, applicable CWA standard, or activities alleged to constitute violations of this standard, Simplot first contends SRW's Notice failed to sufficiently identify the location and method of Simplot's alleged violations. Simplot contends the Feedlot covers an approximately 2.5 square mile

area, the land application fields another 7.4 square mile area, and that SRW's Notice failed "to identify where in this expansive area discharges are occurring, much less how such discharges allegedly reach the tributaries that are 'suspected' to further convey such discharges to the Snake River." Dkt. 21-1, at 15–16 (quotations in original). Although SRW's Notice alleged that contaminated water from the Grand View Facility "discharges to the Snake River via tributaries such as the Middle Line Canal, Low Line Canal, Jack Creek, Corder Creek, and other tributaries and conduits" (Dkt. 1-1, at 5), Simplot argues SRW's Notice did not identify the specific discharge point, "much less the particular canal, ditch, creek, or '[unidentified] other conduit' that allegedly receives discharges from the Feedlot." Dkt. 21-1, at 16 (brackets in original) (quoting Dkt. 1-1, at 5). Simplot maintains SRW's purported "lack of precision flips the purpose of the 60-day notice requirement on its head and puts the burden on Simplot to guess where the discharge emanates from." Dkt. 21-1, at 16. The Court disagrees.

The notice regulation does not require that plaintiffs "list every specific aspect or detail of every alleged violation." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) ("*Bosma Dairy*") (quoting *Pub. Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)). "As long as the information in the notice letter is 'reasonably specific' as to the nature and time of the alleged violation, the CWA notice requirement is fulfilled." *San Francisco Herring Ass'n v. Pac. Gas and Elec. Co.*, 81 F. Supp. 3d 847, 857 (N.D. Cal. 2015) ("*San Francisco Herring*") (quoting *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002) ("*Tosco*"). "The key language in the notice regulation is the phrase 'sufficient information

MEMORANDUM DECISION AND ORDER – 17

to permit the recipient to identify' the alleged violations and bring itself into compliance." *Bosma Dairy*, 305 F.3d at 951 (quoting 40 C.F.R. § 135.3(a)). The Court finds SRW's Notice provided such "sufficient information." 40 C.F.R. § 135.3(a).

First, the CWA's notice regulation does not require, and Simplot does not cite authority to suggest, that a notice must identify specific discharge points or exact discharging locations. *See Bosma Dairy*, 305 F.3d at 951. Instead, a notice must identify "the location of the alleged violation." 40 C.F.R. § 135.3(a). As SRW argues, SRW's Notice did so here by identifying the Grand View Facility—a CAFO and statutorily defined "point source" under the CWA—as the location of Simplot's alleged violation. 33 U.S.C. § 1362(14). While Simplot dismisses this argument as a mere "legalism" (Dkt. 28, at 3), district courts within the Ninth Circuit have deemed notice letters sufficient where, as here, the notice identified a point source under 33 U.S.C. § 1311(a) as the "location of the alleged violation."[17] 40 C.F.R. § 135.3(a).

For instance, in *San Francisco Herring,* the defendant formerly owned and operated three defunct manufactured gas plants ("MGPs") spanning multiple city blocks of San Francisco. 81 F. Supp. 3d at 852–53. Plaintiffs brought suit under the CWA and RCRA, alleging that defendant's MGPs continued to discharge hazardous waste into the San Francisco Bay. *Id*. at 854. Defendant moved to dismiss the complaint due to insufficient

---

[17] In its Reply brief, Simplot highlights that it owns grazing pastures in Grand View that are not a part of its Feedlot or land application fields, and thus fall outside of the statutory definition of a CAFO. Dkt. 28, at 3 n.1. "Only discharges of pollutants from "point sources" fall within the purview of the NPDES program." *San Francisco Herring*, 81 F. Supp. 3d at 861 (citing 33 U.S.C. § 1311(a)). Because SRW's Notice identifies the Grand View Facility as the specific CAFO and point source at issue, any land which is not a part of this point source is beyond the scope of this lawsuit.

notice.[18] *Id.* at 856–57. Like Simplot, defendant in *San Francisco Herring* argued the notice's identification of three large MGPs as the location of the violation was insufficient because the notice failed to specify the "manner and method by which MGP waste in groundwater is transported to the Bay." *Id.* at 857. The district court denied defendant's motion to dismiss, holding plaintiffs' notice adequately identified the location of the violation because it specified the three MGPs were "the relevant point sources." *Id.* Significantly, the court further held plaintiff's failure to specify the "manner and method by which MGP waste in groundwater is transported to the Bay" was immaterial because the notice identified the relevant point sources, and thus adequately identified the location of the alleged violation. *Id.*

Similarly, in *Puget Soundkeeper All. v. Cruise Terminals of Am.*, *LLC*, 216 F. Supp. 3d 1198, 1209–10 (W.D. Wash. 2015) ("*Puget Soundkeeper*") plaintiff's notice identified a cruise terminal's drainage system as the relevant point source and location of the alleged violation.[19] Like Simplot, defendants sought dismissal, arguing that in order to adequately identify the location of the alleged violation, plaintiff needed to identify specific discharge points within the drainage system. Noting "[n]either Defendant provides any binding

---

[18] Defendant in *San Francisco Herring* also argued plaintiffs failed to state a claim because, *inter alia*, the MGPs did not constitute point sources. *Id.* at 860.  While finding plaintiff's notice sufficiently identified the MGPs as the location of the violation, the district court also held the question of whether an entire facility or plant can be considered a point source within the purview of the NPDES program was an issue for summary judgment not appropriately resolved on a motion to dismiss. *Id.* at 862.

[19] Plaintiffs in *Puget Soundkeeper* also identified the cruise terminal as a point source, but the court held plaintiffs failed to explain how the cruise terminal itself, separate from the terminal's stormwater drainage system, operated as a point source. *Id.* at 1210. As noted, because it is undisputed the Grand View Facility is a CAFO, it is a point source under the CWA. 33 U.S.C. § 1362(14).

authority for this point," the court disagreed. *Puget Soudkeeper*, 216 F. Supp. 3d at 1210.

The court explained:

> [a]lthough a discharge must occur from a point source in order to require a permit under the CWA, a notice letter need not identify every specific discharge point at a facility: the crux of proper notice is whether Defendants were sufficiently informed so as to be able to remedy the alleged violations.

*Id*. at 1210 (citing *Tosco*, 309 F.3d at 1158). Because plaintiff's notice identified the

stormwater drainage system at the cruise terminal as the point source at issue, the *Puget*

*Soundkeeper* court held the notice provided defendants with sufficient notice of the

location of the alleged violation. *Id*.

In *Honeywell*, 830 F. Supp. 2d at 768, plaintiff's notice identified defendant's

recycling plant ("Site"), and various point sources within the Site, as the location of

defendant's alleged violation. Defendant moved to dismiss, arguing the notice was

inadequate because it did not identify the specific location from which pollutants were

being discharged. *Id*. Instead, the notice stated defendant had unlawfully discharged

pollutants from various point sources within the Site, including "ground storage tanks,"

"recycling equipment," and "waste ponds." *Id*. The notice also stated: "River Watch hereby

notifies Polluters of the fact that they have no NPDES permit allowing them to discharge

pollutants to waters of the United States from the Site and numerous point sources within

the Site . . . ." *Id*. The court deemed such notice sufficient and denied defendant's motion

to dismiss. In so holding, the court explained plaintiff's notice adequately identified the

location of the alleged violation because it identified both various point sources and

"defendant's lack of a permit" to discharge pollutants from such point sources. *Id*. As such,

the notice was sufficient. *Id*.

Simplot highlights the fact that the *Honeywell* court held the plaintiff's notice was adequate because it specifically described how contaminated water allegedly discharged from the Site. Dkt. 21-1, at 17. Simplot maintains that in finding the notice sufficient, the *Honeywell* court specifically stated that the plaintiff had identified "how the point sources were allegedly discharging into the waters." *Id*. (quoting *Honeywell*, 830 F. Supp. 2d at 768). However, plaintiff's notice in *Honeywell* did not identify any of the specific conduits through which pollutants were purportedly discharged. *Honeywell*, 830 F. Supp. 2d at 768. The notice simply stated "[t]hese point sources continue to discharge from the Site through conduits, that act as preferential pathways, to the estuary adjacent to the Site." *Id*. Similarly, SRW's Notice alleged pollutants from the Grand View Facility flow into the Snake River through "tributaries, ditches, and drainage canals[.]" Dkt. 1-1, at 4. Like the notice at issue in *Honeywell*, SRW's Notice explained that contaminated water is allegedly discharged from the Grand View Facility to the Snake River through various conduits to the Snake River. Moreover, unlike the notice deemed sufficient in *Honeywell*, SRW's Notice went further than suggesting pollutants discharge through unidentified "conduits," and instead delineated specific tributaries—including the Middle and Low Line Canals and Jack and Corder Creeks—through which pollutants from the Grand View Facility are discharged to the Snake River. *Id.* at 5.

Simplot also suggests SRW's Notice is analogous to notice deemed insufficient in *Ctr. Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 802 (9th Cir. 2009) ("*Marina Point*"). Dkt. 21-1, at 16–17. In *Marina Point*, plaintiff sent defendant

condominium developer several notices of plaintiff's intent to commence suit under the CWA because, among other issues, the development was placing "enormous amounts of fill into the lake." *Marina Point*, 566 F.3d at 802. With respect to identifying the location of the alleged violation, the Ninth Circuit held plaintiff's notices were insufficient because they did not "give any detail whatsoever regarding just what 'wetlands' were allegedly being affected" by the fill material. *Id*. Simplot suggests SRW's Notice is like that in *Marina Point* because it purportedly failed to identify the specific canal, ditch, or creek that the Grand View Facility allegedly discharges into, "much less how those pollutants then find their way to the Snake River." Dkt. 21-1, at 17. Simplot's argument ignores that unlike the notice in *Marina Point*, SRW's Notice identified the Snake River as the navigable water to which pollutants are discharged, as well as the suspected path of pollutants from the Grand View Facility to the Snake River. Dkt. 1-1, at 5 ("[C]ontaminated water then discharges to the Snake River via tributaries such as the Middle Line Canal, Low Line Canal, Jack Creek, Corder Creek, and other tributaries and conduits."). As noted, SRW's Notice also provided maps showing Simplot's parcel ownership and the flow of these named tributaries and conduits from the Grand View Facility to the Snake River. *Id.* at 11–13. Further, SRW's Notice identified the specific section of the Snake River to which the Grand View Facility discharges, the "'Middle Snake / Succor' subdivision, specifically 'SW-6, Snake River: C.J. Strike Dam to river mile 425 (T02N, R04W, Sec. 2).'" *Id*. at 8. Thus, SRW's Notice was far more specific than the notices rejected by the Ninth Circuit in *Marina Point*.

 With respect to the land application fields, Simplot argues SRW's Notice failed "to

identify even a single field or location within a field that has allegedly received any manure, let alone excess manure. Nor has SRW identified a single specific instance of manure over-application." Dkt. 21-1, at 18. But the notice regulation does not require such specificity. Instead, SRW need only identify the activity alleged to constitute a violation and the location of the alleged violation. 40 C.F.R. § 135.3(a). SRW's Notice identified the location of the violation with respect to Simplot's land application fields by identifying the specific agricultural parcels at issue. Dkt. 1-1, at 6 n.6.

In addition, SRW's Notice identified the activity alleged to constitute a violation by explaining that Simplot applies manure to such fields "in quantities, and at rates and times, that are not compliant" with any nutrient management plans. *Id*. at 6. Nutrient management plans are used by CAFOs to ensure that their application of manure wastes do not lead to surface water discharges. 40 C.F.R. § 412.4(c)(1). As SRW highlights, Simplot is aware of this requirement since it previously held a NPDES permit for discharges from the Grand View Facility. Dkt. 26, at 14. Moreover, while Simplot is required under 40 C.F.R. § 122.42(e)(1)(vi)–(ix) to ensure that the application of manure or process wastewater has been accomplished in accordance with site-specific nutrient management plans, field-specific manure application records are only available to the public to the extent a CAFO maintains a NPDES permit. Dkt. 26, at 14 n. 5. Because Simplot admittedly does not have a NPDES permit for the Grand View Facility, SRW's Notice could not identify the specific fields to which manure has allegedly been overapplied.

Throughout its briefing, Simplot also highlights that the Grand View Facility spans more than six thousand acres, and approximately nine square miles, and argues SRW's

Notice failed to sufficiently identify the location of the violation because it did not pinpoint specific discharge points within this "massive point source." Dkt. 21-1, at 7, 11–12, 15, 18–19; Dkt. 28, at 9–10. Significantly, the Ninth Circuit held a notice sufficiently identified the location of the alleged violation where the plaintiff identified representative point sources within a much larger area than that at issue here. Specifically, in *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 507, 519 (9th Cir. 2013), plaintiff's notice alleged that defendant PG & E had violated the CWA and RCRA by discharging "pollutant-bearing storm water runoff" from "each and every" utility pole treated with a specific preservative in Alameda, Contra Costa, Marin, and San Francisco counties.[20] The notice included a non-exhaustive list of representative poles, but did not otherwise identify the specific utility poles at issue. *Id*. at 507. PG & E sought dismissal, arguing the notice did not identify the specific utility poles at issue, and thus failed to adequately identify the location of the alleged violations. *Id*. at 518–19. The district court denied PG & E's motion, and the Ninth Circuit affirmed. In so holding, the Ninth Circuit explained:

> [N]otice that preservative-treated utility poles owned by PG & E and/or other entities in four counties allegedly discharged pollutants during days of significant precipitation was sufficient to advise PG & E of [plaintiff's] claims, especially where [plaintiff] identified representative poles and referenced PG & E's superior ability to ascertain the locations of other poles that might be at issue.

---

[20] By way of comparison, while Simplot emphasizes the Grand View Facility covers approximately nine square miles, the area at issue in *Ecological Rights* was more than 2,000 square miles. *See, e.g.*, https://data.census.gov/profile/Alameda_County,_California?g=050XX00US06001 (Alameda County is 737.5 square miles); https://data.census.gov/profile/Contra_Costa_County,_California?g=050XX00US06013 (Contra Costa County is 716.9 square miles); https://data.census.gov/profile?q=Marin%20County,%20California (Marin County is 520.1 square miles); https://data.census.gov/profile?q=San%20Francisco%20County,%20California (San Francisco County is 46.7 square miles).

*Id*. at 519.

Similarly, SRW's Notice identified the Grand View Facility as the location of the alleged violation, and, like the notice at issue in *Ecological Rights*, went further by identifying representative point sources within this large area, including the Middle Line Canal, Low Line Canal, Jack Creek, and Corder Creek, from which discharges from the Grand View Facility flow to the Snake River. Dkt. 1-1, at 5.[21] As outlined above, SRW's Notice also included a flow map and parcel map showing how these and other tributaries flow through the Grand View Facility. *Id.* at 7, 11–13. SRW's Notice further provided aerial Google imagery showing the lack of diversion and containment structures at the Grand View Facility, as well as Simplot's comments to the EPA noting Simplot's admission that it does not divert clean water from the Feedlot. *Id.* at 4–5, n.4. As SRW argues, a reasonable entity in Simplot's position would review such information and understand SRW's allegations: pollutants from the Grand View Facility are flowing to the Snake River through the creeks, canals, and other conduits on and surrounding the Grand View Facility. Dkt. 26, at 12–13.

To further assist Simplot in identifying the location of its alleged violation, SRW also detailed corresponding surface water quality monitoring data from samples taken from conduits into which the Grand View Facility purportedly discharges, as well as from the Snake River itself. Dkt. 1-1, at 6–7. For instance, one of the identified tributaries—the Low

---

[21] SRW notified Simplot that it would also plead such specified tributaries and conduits are waters of the United States. *Id.* at 5 n.5.

Line Canal—flows directly south of the Feedlot and travels westerly through Simplot's land application fields, where it discharges into the Snake River. Dkt. 1-1, at 7. That location directly corresponds to SRW's water sampling point "SPG," which stands for "Snake River Below Grand View." *Id*. SRW's flow map also identified sampling locations within Simplot's CAFO itself ("BR2" and "BR3" on the flow map), as well as locations where discharges occurred directly into the Snake River ("TPD" and "TD" on the flow map). *Id*. SRW's sampling effort included testing of a piped discharge point from Simplot's land application fields directly into the Snake River.[22] *Id*. SRW's sampling data revealed consistently high levels of E.coli, coliform, nitrogen, and phosphorous compounds—pollutants indicative of cow manure. *Id.* at 6. SRW's sampling results also showed the Snake River is cleaner upstream of the Grand View Facility than it is downstream. *Id*. at 8.

As in *San Francisco Herring*, *Puget Soundkeeper*, and *Honeywell*, SRW's Notice sufficiently identified the location of the alleged violation because it identified the specific point source—the Grand View Facility—from which pollutants are allegedly unlawfully discharged. However, SRW's Notice was even more specific than those deemed sufficient in the aforementioned cases because, like the notice at issue in *Ecological Rights*, SRW's

---

[22] Simplot faults SRW from failing to "sample[] an outfall" on the Grand View Facility. Dkt. 21-1, at 14. However, SRW could not take water samples from outfalls on the Grand View Facility itself without trespassing on Simplot's private property. Neither the CWA nor the notice regulation require a plaintiff to gain access to the defendant's land to essentially prove an unlawful discharge claim prior to bringing suit. Simplot further contends SRW failed to "allege that the only possible source of these allegedly elevated analytes is the cattle manure generated at the Feedlot" and also did not "provide any information as to the date, time, or place that [SRW] allegedly witnessed a discharge occurring." *Id*. at 14, 16. The notice regulation does not require a plaintiff to allege either that the defendant's purportedly unlawful conduct is the *only* possible source of pollutants, or that the plaintiff witnessed the defendant's alleged violation, or the time of the alleged violation, and Simplot does not cite any authority to suggest it does. Instead, a notice must simply identify the location of the alleged violation. 40 C.F.R. § 135.3(a). SRW's Notice did so here.

Notice further identified: (1) representative point sources within the Grand View Facility through which pollutants are transported to the Snake River, including through the Middle Line Canal, Low Line Canal, Jack Creek, and Corder Creek; (2) a flow map illustrating how pollutants travel from the Grand View Facility to the Snake River; (3) extensive sampling data supporting SRW's unlawful discharge claim, as well as specific sampling locations; (4) the specific compounds causing contamination; and (5) the specific section of the Snake River to which the Grand View Facility discharges. Dkt. 1-1, at 5–8. Although the notice regulation does not require such specificity, SRW's Notice tied Simplot's alleged violations—including failure to obtain a NPDES permit, overapplication of manure, failure to install adequate wastewater containment structures, and failure to ensure that clean water is diverted away from the Feedlot—to specific waterways, and provided water quality data showing that such waterways are likely polluted by cow manure.

Finally, it is important to note that Simplot's alleged violation involves its failure to obtain an NPDES permit for the Grand View Facility, as well as Simplot's alleged improper manure and process wastewater management, lack of clean water diversion, and improper operational practices at the Grand View Facility as a whole. Dkt. 1-1, at 4. Thus, unlike other CWA cases, SRW does not allege that "a particular discharge from a particular pipe on a particular day" violated the CWA. *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000) ("*Nat. Res. Def. Council II*"). Rather, SRW's suit involves Simplot's failure to implement required pollution prevention measures—such as a NPDES permit—at the Grand View Facility. Dkt. 1-1, at 4–6. As such, "it is legitimate to allege that the violations are occurring at the [Grand View Facility] in general, because

the facility has not implemented the proper CWA plans." *Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996) ("*Nat. Res. Def. Council I*") *aff'd sub nom. Nat. Res. Council II*, 236 F.3d 985 (9th Cir. 2000).[23]

In sum, the Court finds SRW's Notice adequately identified the Grand View Facility as the location of the violation and, in conjunction with the extensive information included with the Notice—including relevant point sources within the Grand View Facility, sampling data, sampling locations, aerial images showing a lack of clean water equipment, identification of Simplot's parcel ownership, and flow map of tributaries running through the Grand View Facility to the Snake River—provided sufficient information for Simplot to identify its violation and bring the Grand View Facility into compliance. *Tosco*, 309 F.3d at 1158 (explaining "notice is sufficient if it is specific enough to give the accused company the opportunity to correct the problem") (cleaned up).

c. Dates of Alleged Violations

SRW's Notice alleged Simplot's unlawful discharges occurred on or around the dates SRW took water quality samples: June 11, 2017; June 12, 2017; August 25, 2017;

---

[23] In *Nat. Res. Def. Council I*, defendant shipyard's alleged violations involved its failure to prepare and implement pollution prevention plans required under the shipyard's NPDES permit. 945 F. Supp. at 1333. Under such circumstances, the district court held, and the Ninth Circuit affirmed, that plaintiff's notice sufficiently identified the location of the violation by alleging shipyard's failure to develop and implement pollution prevention plans occurred "at the facility in general." *Id.*; *Nat. Res. Council II*, 236 F.3d at 996. Similarly, given Simplot's alleged unpermitted discharges, SRW's Notice sufficiently identified the location of the alleged violation as the Grand View Facility—a CAFO statutorily prohibited from discharging pollutants in the absence of a NPDES permit. 33 U.S.C. § 1311(a). Moreover, as outlined above, SRW's Notice went further than that upheld in *Nat. Res. Council II*, 236 F.3d at 996, by identifying where discharges from the Grand View Facility are suspected to occur, corresponding surface water quality monitoring from specific areas around the Grand View Facility—showing how contamination moves from the site into the Snake River—and specific conduits through which pollutants move from the Grand View Facility to the Snake River.

May 5, 2022; June 28, 2022; September 29, 2022; September 30, 2022; October 3, 2022; October 4, 2022; October 5, 2022; October 6, 2022; and October 7, 2022. Dkt. 1-1, at 6. SRW's Notice further maintained that the "breadth of the sampling data—data taken nearly five years apart—demonstrates that discharges from [the Grand View Facility] are ongoing and continuous, and have occurred each day for at least the past five years."[24] *Id*. at 6. Simplot argues SRW's Notice's "recitation of the dates SRW *sampled* does not render it 'sufficient' to allow Simplot to ascertain when it allegedly *discharged*, much less that its discharge is 'ongoing' within the meaning of the citizen suit provision." Dkt. 21-1, at 19 (emphasis in original) (citing *Gwaltney*, 484 U.S. at 64; 33 U.S.C. § 1365(a)). Again, the Court disagrees.

Notably, courts have not required a plaintiff to identify the specific date of an alleged violation where, as here, "a violation . . . is premised on the alleged violator's failure to act." *Friends of Frederick*, 124 F. Supp. 2d at 1168 (citing *Nat. Res. Def. Council I*, 945 F. Supp. at 1333). This is because challenging a general failure to comply with the CWA's requirements is "far different than challenging specific instances of illegal discharge." *Nat'l Res. Def. Council I*, 945 F. Supp. at 1333. "When describing the failure to perform an act, it is impossible to describe" the date and location "with the same specificity used when describing an affirmative act," such as an illegal discharge from a specific pipe at an industrial facility. *Id*. Instead, plaintiffs "can only allege who was

---

[24] SRW's Notice presumably identified this five-year time period because there is a five-year statute of limitations for bringing citizen suits under the CWA. *Sierra Club v. Chevron U.S.A., Inc*., 834 F.2d 1517, 1521–22 (9th Cir. 1987) (holding five-year limitations period established in 28 U.S.C. § 2642 is applicable to CWA citizen suits).

supposed to act, what they were supposed to do, and that they have failed to do it." *Id.* SRW's Notice did so by alleging Simplot has failed to obtain a NPDES permit authorizing discharges from the Grand View Facility. Dkt. 1-1, at 4 ("Simplot does not possess an individual or general CAFO NPDES Permit for the [Grand View Facility], making each and every discharge a violation of the Clean Water Act."). Because Simplot's failure to obtain a NPDES permit authorizing alleged discharges is ongoing, "there is no specific date that can be alleged as the date of the violation." *Nat'l Res. Def. Council I*, 945 F. Supp. at 1333. Instead, as long as Simplot discharges pollutants without a NPDES permit, "the violations will continue each and every day." *Id.*; *see also Honeywell*, 830 F. Supp. 2d at 768 (finding notice adequately identified the dates of the violation by providing a five-year range of dates for continuous violation of discharging pollutants from a point source without a valid NPDES permit).

Thus, SRW's Notice sufficiently identified the date or dates of the alleged violation by contending discharges from the Grand View Facility "are ongoing and continuous, and have occurred each day for at least the past five years." Dkt. 1-1, at 6. Where, as here, a plaintiff alleges an ongoing problem rather than a specific incident, a date range is sufficient to put the defendant on notice "of when the endangerment to health and the environment allegedly occurred." *Honeywell*, 830 F. Supp. 2d at 767 (holding notice alleging violation occurred within the five-year statute of limitations under the RCRA provided "a limited range of dates—October 2005 to October 2010"—and was sufficient because the notice alleged an ongoing problem rather than a specific incident); *Nat'l Res. Def. Council I*, 945 F. Supp. at 1333 (explaining that because defendant's violations were

ongoing, "there is no specific date that can be alleged as the date of the violation. As long as [defendant] operates without a legally adequate [environmental compliance plan] the violations will continue each and every day."); *Tosco*, 309 F.3d at 1158 ("Where [plaintiff] alleged an ongoing violation of [defendant's] obligation to implement best available technology to prevent storm water pollution, no specific dates were needed.").[25]

Further, even where a notice does not allege an ongoing violation, the notice regulation "only requires the plaintiff to provide enough information to permit the recipient to identify the dates of the violations; the regulation does not require the notice itself to contain the relevant dates." *Friends of Frederick*, 124 F. Supp. 2d at 1168 (citing 40 C.F.R. § 135.3(a)). A notice is sufficient where, as here, it identifies some dates of violation, if additional violations are "from the same source," "of the same nature," and are "easily identifiable." *Bosma Dairy*, 305 F.3d at 953. SRW's notice provided enough information to permit Simplot to identify the dates of its alleged violation because it identified twelve specific days Simplot discharged pollutants to the Snake River without a valid NPDES permit, and further alleged additional violations originating from the same source (the Grand View Facility) which deposited the same waste material (E.coli and other indicators of cow manure) into the same specific portion of the Snake River. Dkt. 1-1, at 6, 8. "Thus, in essence all of [Simplot's] alleged violations are a single violation that repeated over a span of time" and SRW's Notice adequately identified the dates of Simplot's alleged

---

[25] Simplot relies upon *Cal. Sportfishing Prot. All. v. City of W. Sacramento*, 905 F. Supp. 792, 800 (E.D. Cal. 1995) to argue notice is insufficient where it alleges violations occurred over a five-year period without providing more specificity. Dkt. 21-1, at 20. However, rather than a continuous violation like SRW alleges here, *Cal. Sportfishing* involved plaintiffs' suit for "specific, discrete discharges which occur[ed] over a finite period." *Nat'l Res. Def. Council I*, 945 F. Supp. at 1333 (citing *Cal. Sportfishing*, 905 F. Supp. 792).

ongoing violation. *Bosma Dairy*, 305 F.3d at 952 (citation omitted).

Simplot argues SRW's sampling data is insufficient to allow Simplot to identify the dates of its alleged violations because SRW "merely took samples on certain enumerated dates in 2017 and 2022 from public access locations," and not from a pipes or other conduits on the Grand View Facility. Dkt. 21-1, at 19–20. Again, neither the CWA nor the notice regulation require a plaintiff to obtain access to a defendant's private property, and SRW obtained surface water quality samples from as close to the Grand View Facility as it could reach without engaging in trespass. Dkt. 26, at 16. Moreover, the flow map with SRW's Notice showed nine different locations where SRW's water quality sampling occurred, and explained that some locations were upstream from the Grand View Facility, some were located close to the Feedlot and land application fields, and some were located downstream from the Grand View Facility. Dkt. 1-1, at 7. Notably, SRW's sampling data showed water is much cleaner upstream from the Grand View Facility than it is downstream. *Id*. at 8, 14–15. Further, based on the presence of manure pollutants in SRW's samples and the fact that Simplot owns virtually all nearby upgradient property, SRW's Notice provided Simplot with enough information for it to identify the dates of claimed violations. *Friends of Frederick*, 124 F. Supp. 2d at 1168.

In short, because SRW's Notice alleged an ongoing violation, SRW was not required to list specific dates of Simplot's alleged violations. *Nat. Res. Def. Council I*, 945 F. Supp. at 1333. SRW's 5-year range of dates in which Simplot has allegedly discharged pollutants into the Snake River without a NPDES permit was sufficient to put Simplot on notice of its conduct that has allegedly endangered the environment and when that conduct

occurred. *Honeywell*, 830 F. Supp. 2d at 768. Moreover, because it also provided specific dates of violations from the Grand View Facility—violations that are all of the same type and cause the same pollution to the same portion of the Snake River—SRW's Notice gave Simplot enough information to allow Simplot to identify the dates of its alleged violations. *Bosma Dairy*, 305 F.3d at 953; *see also Tosco*, 309 F.3d at 1158 (finding notice was sufficient where it identified fourteen dates of specific wrongful conduct, and alleged the same wrongful conduct was continuously repeated).

### d. <u>Ongoing Violation</u>

Finally, Simplot argues the Court lacks subject matter jurisdiction because SRW's Notice failed to "establish" an ongoing violation. Dkt. 21-1, at 2 (citing *Gwaltney*, 484 U.S. at 67; *Nat. Res. Def. Council II*, 236 F.3d at 998). In support, Simplot argues the only facts supporting SRW's ongoing violation allegation "correspond to alleged stormwater events in a part of the state that receives very little—if any—rain for the vast majority of the days of every year." *Id*. However, Simplot does not cite any regulation or caselaw requiring that a plaintiff *establish* an ongoing violation in a notice letter.[26] Instead, *Gwaltney* pertained to the jurisdictional grant in 33 U.S.C. § 1365(a), which authorizes citizen suits in federal court against any person "who is *alleged* to be in violation" of an effluent standard or limitation. *Gwaltney*, 484 U.S. at 64 (emphasis added). *Gwaltney's* ruling appears to apply to complaints, not notice letters, and here SRW's Complaint alleges an ongoing violation

---

[26] Simplot may certainly use the lack of precipitation in Grand View, Idaho to refute SRW's unpermitted discharge claim on summary judgment or at trial. However, for purposes of the instant Motion to Dismiss, the Court finds SRW has made good faith allegations regarding Simplot's ongoing violation despite the weather conditions Simplot highlights.

of the CWA because Simplot has not had a NPDES permit for the last five years, and continues to discharge pollutants without a NPDES permit today. Dkt. 1, ¶¶ 34–38, 66 (sampling data showing nature of ongoing violation), 80–83 (allegations of ongoing violation). Moreover, even if Simplot had cited any authority to suggest *Gwaltney* applies to notice letters, SRW's Notice repeatedly alleged Simplot's discharges are ongoing and continuous. Dkt. 1-1, at 4, 6, 9.

Further, while, to prevail at trial, "a citizen-plaintiff must prove that ongoing violations actually have occurred," the CWA "confers jurisdiction over citizen suits when the citizen-plaintiffs make a *good-faith allegation* of continuous or intermittent violation." *Nat. Res. Def. Council II*, 236 F.3d at 998 (emphasis added) (cleaned up). SRW has done so here—both in its Notice and Complaint—by repeatedly alleging that Simplot has and continues to discharge pollutants from the Grand View Facility to the Snake River without a NPDES permit. Dkt. 1-1, at 4–6, 8; Dkt. 1, ¶¶ 36–38, 42, 52, 64, 66, 80–83. SRW's Notice and Complaint further allege that, among other issues, Simplot's improper manure and process wastewater management, lack of clean water diversion, and improper operational practices "have caused and *continue to cause* unpermitted discharges of liquid and solid animal waste and process wastewater to waters of the United States." Dkt. 1-1, at 4–6 (emphasis added); Dkt. 1, ¶¶ 42, 44, 47–50, 57, 64, 66.

SRW's Notice and Complaint contain sufficient facts to support the aforementioned allegations, including: (1) Simplot's failure to obtain a NPDES permit since its original NPDES permit expired in 2012; (2) SRW's extensive water sampling data from conduits into which the Grand View Facility discharges, revealing high E.coli results downstream

from the Grand View Facility; (3) SRW's map of sampling locations upstream, surrounding, and downstream from the Grand View Facility; (4) aerial and satellite imagery showing Simplot has not installed diversion structures, or alternative conservation measures, to control and detain precipitation falling on, and stormwater entering, the Grand View Facility; (5) Simplot's admission that it is unable to control, divert, or detain the precipitation falling onto and entering the Grand View Facility; (6) SRW's map of the Snake River and the conduits that allegedly transport and discharge pollutants from the Grand View Feedlot into the Snake River; (7) SRW's identification of Simplot's relevant parcel ownership; and (8) SRW's map showing Simplot's ownership of the developed, upgradient property to the Grand View Feedlot, which includes the land application fields. Dkt. 1-1, at 4–8, 11–15; Dkt. 1, ¶¶ 34–52, 54–67, 71–72.

Because both SRW's Notice and its Complaint contain adequate facts to support SRW's claim that Simplot's alleged violation is ongoing, the Court has subject matter jurisdiction to hear this case.

### B.  SRW's Unpermitted Discharge Claim

In addition to challenging the Court's subject matter jurisdiction, Simplot argues SRW's unpermitted discharge claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because it recites vague and conclusory allegations of the elements of a CWA claim but fails to allege sufficient facts to support such elements.

As noted, to state an unpermitted discharge claim, a plaintiff must allege that: (1) a person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point source (6) without or in violation of a NPDES permit. *S.F. Bay Keeper*, 791 F.

Supp. 2d at 754. Simplot does not dispute that it is a "person" under the CWA, that its lacks a NPDES permit, that the Grand View Facility is a point source, or that the Snake River is the purported navigable water at issue. Dkt. 21-1, at 22–26. Instead, Simplot reiterates the arguments it made with respect to the adequacy of SRW's Notice, including that SRW has not identified the location of Simplot's alleged discharges, has not explained the cause of the discharges, and has not identified the pathway by which such discharges flow from the Grand View Facility to the Snake River. *Id.* Like its Notice, SRW's Complaint does each of these things.

SRW's Complaint identifies the Grand View Facility, as well as the Middle Line Canal, Low Line Canal, Jack Creek, Corder Creek, and other ditches and drainage canals that flow into the Snake River from the Grand View Facility, as the relevant point sources of Simplot's discharges. Dkt. 1, ¶¶ 20, 26, 27, 37, 41, 55, 79. SRW need not identify every exact discharge location in order to state a claim; its identification of the point sources from which Simplot allegedly discharges is sufficient. *S.F. Bay Keeper*, 791 F. Supp. 2d at 754; *Honeywell*, 830 F. Supp. 2d at 770–71 (holding plaintiff stated an unpermitted discharge claim where it alleged defendants were discharging pollutants from their site, as well as from various point sources within the site).

SRW's Complaint further explains Simplot discharges from the Feedlot due to Simplot's "improper manure and process wastewater management, lack of clean water diversions, and improper operational practices." *Id.*, ¶¶ 42, 47. In support, SRW's Complaint includes aerial imagery of the Grand View Facility illustrating Simplot has not installed diversion structures, adequate wastewater containment structures, or alternative

conservation measures such as wastewater treatment facilities, to control and detain precipitation and stormwater on the site. *Id*., ¶¶ 44, 48. SRW's Complaint further explains precipitation runs onto the Feedlot from upgradient areas—a fact Simplot admitted in its letter to the EPA[27]—and comingles with animal waste and other pollutants. *Id*., ¶¶ 43, 49. SRW's Complaint also demonstrates Simplot is the owner of real property located upgradient from the Feedlot. *Id*., ¶ 51 (citing Dkt. 1-1, at 11–12). SRW's Complaint then identifies the pathway by which Simplot's alleged discharges occur: through tributaries such as the Middle Line Canal, Low Line Canal, Jack Creek, Corder Creek, and other tributaries and conduits. *Id*., ¶ 45. SRW's Complaint also provides sampling data to both identify the location of Simplot's alleged discharges from the Feedlot and establish the presence of manure pollutants in such waters. *Id*., ¶¶ 58–65. Thus, SRW's Complaint identifies the cause of Simplot's alleged discharges from the Feedlot, as well as the pathway by which such discharges flow from the Feedlot to the Snake River.

SRW contends that the cause of Simplot's discharges from the land application fields is Simplot's application of manure "to their fields in quantities, and at rates and times, that are not compliant with" nutrient management plans. *Id*., ¶ 57. As a result, SRW alleges Simplot's land application of manure causes manure pollutants to discharge through pipes, culverts, drains, and other conduits on Simplot's land application fields, into irrigation ditches and canals that are tributaries to the Snake River. *Id*.

---

[27] Simplot's repeated contention that SRW cannot allege an ongoing violation, or state an unlawful discharge claim, due to the lack of precipitation in Grand View (Dkt. 21-1, at 7, 11, 20, 21) seems puzzling in light of Simplot's admission to the EPA that it is "not feasible to contain run on water at Simplot's Grand View property due to *the enormous volume of run on water* from thousands of acres of BLM land up-gradient of the facility." Dkt. 1, ¶ 49 (emphasis added).

While Simplot argues such allegations constitute mere legal conclusions, SRW's Complaint provides supporting information, including photographs of Simplot's piping infrastructure, depicting apparent discharges directly from Simplot's pipes into a ditch purportedly running through Simplot's land application fields.[28] As detailed above, SRW also supports its allegations regarding Simplot's over-application of manure with sampling data from publicly accessible locations surrounding the Grand View Facility, as well as from the Snake River itself. *Id*., ¶¶ 58–63. Such samples show consistently high levels of total coliform and E.coli, both indicators of pollution from cow manure, as well as the existence of nitrogen and phosphorous compounds consistent with cow manure. *Id*., ¶ 64 (citing Dkt. 1-1, at 14–15).

Simplot also argues SRW has not pleaded sufficient facts to allow the Court to draw the reasonable inference that Simplot is liable for such pollution because SRW failed to allege either that the Grand View Facility is the *only* source of cattle manure in the area, or that SRW identified analytes that could *only* come from the Grand View Facility. Dkt. 21-1, at 26. Simplot does not cite any authority to suggest SRW is required to allege that Simplot is the sole source of pollution in order to state a claim, and the CWA "does not impose liability only where a point source discharge creates a net increase in the level of

---

[28] Simplot argues that "while SRW offers two photos of pipes that appear to be discharging into a ditch or canal, it does not allege that these pipes are located near Grand View, much less that they drain Simplot's fields." Dkt. 21-1, at 25. However, SRW's Complaint alleges Simplot's "*land application of manure* causes manure pollutants to discharge through pipes, culverts, drains, and other conduits into the irrigation ditches and canals that are tributaries to the Snake River, *as depicted below*." Dkt. 1, ¶ 57 (emphasis added). The photographs are directly below the aforementioned statement. *Id*. Thus, SRW's Complaint—though perhaps not as clear as it could have been—sufficiently identifies the photographs as depicting pipes discharging directly into ditches on Simplot's land application fields.

pollution." *Comm. To Save Mokelumne River v. E. Bay. Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993). Instead, "the Act categorically prohibits *any* discharge of a pollutant from a point source without a permit." *Id.* (emphasis added);[29] *see also* 33 U.S.C. § 1311(a) (mandating that unless covered by an exception, "the discharge of *any* pollutant by any person shall be unlawful") (emphasis added); *Cal. Sportfishing Prot. All. v. River City Waste Recyclers*, LLC, 205 F. Supp. 3d 1128, 1151 (E.D. Cal. 2016) ("A party is strictly liable for NPDES Permit violations under the Clean Water Act; there are no exceptions for minimal violations or mistakes.") (cleaned up).

SRW has plausibly alleged an unpermitted discharge claim by contending Simplot discharges manure pollutants to the Snake River from the Grand View Facility, as well as from various point sources within the Grand View Facility, without an NPDES permit. *See S.F. Bay Keeper*, 791 F. Supp. 2d at 754. Such allegations are not mere legal conclusions, but rather are rendered plausible by facts including Simplot's failure to obtain a NPDES permit since 2012, Simplot's parcel ownership, the flow map SRW prepared, aerial imagery showing a lack of clean water diversion equipment on the Feedlot, Simplot's admission that it is unable to control, divert, or detain the precipitation falling onto the Feedlot, photographs of piping infrastructure on Simplot's land application fields, and extensive sampling data from locations in and around the Grand View Facility, as well as

---

[29] Simplot also dismisses SRW's sampling data because SRW does not allege that it identified specific discharge points within the Grand View Facility. Dkt. 21-1, at 25–26. Simplot's argument again ignores both that SRW identifies the Grand View Facility itself as the specific point source causing unpermitted discharges to the Snake River, and that SRW further identifies additional point sources within the Grand View Facility through which unpermitted discharges flow to the Snake River. Dkt. 1, ¶¶ 41, 79–81. Because the CWA prohibits unpermitted discharges of pollutants *from point sources* to waters of the United States, SRW's sampling data supports its unpermitted discharge claim. 33 U.S.C. §§ 1311(a), 1362(12).

from the Snake River itself, illustrating such waters are polluted with manure.[30] Dkt.1, ¶¶

33–72.

## V. CONCLUSION

SRW's Notice satisfied the requirements of 40 C.F.R. § 135.3(a) and both SRW's

Notice, and its Complaint, allege an ongoing violation. As such, the Court has subject

matter jurisdiction over this suit. Further, SRW's Complaint plausibly alleges an

unpermitted discharge claim against Simplot under the CWA. 33 U.S.C. § 1311(a).

Accordingly, Simplot's Motion to Dismiss is denied in its entirety.

## VI. ORDER

1. Simplot's Motion to Dismiss (Dkt. 21) is **DENIED**;

2. The Court's stay on discovery (Dkt. 31) is **LIFTED**;

3. The parties shall submit a Joint Litigation Plan and Discovery Plan on or before

   **July 22, 2024**. The Court will enter a Scheduling Order upon receipt of the Joint

   Litigation and Discovery Plan.

DATED: June 24, 2024

David C. Nye
Chief U.S. District Court Judge

---

[30] Such facts also support allegations SRW made based "upon information and belief"—such as Simplot's alleged overapplication of manure to its land application fields. Dkt. 1, ¶¶ 42, 47, 57. A plaintiff may plead facts upon information and belief where, as here, "the belief is based on factual information that makes the inference of culpability plausible." *Waln. v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)).